COURT OF APPEALS OF VIRGINIA

Present: Judges O'Brien, Malveaux and Senior Judge Frank

JENNIFER WALKER

                                                   MEMORANDUM OPINION[*]
v.       Record No. 1501-19-1                         PER CURIAM
                                                        MARCH 17, 2020

CITY OF VIRGINIA BEACH
  DEPARTMENT OF HUMAN SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
James C. Lewis, Judge

(Catherine Paxson, on brief), for appellant.

(Mark D. Stiles, City Attorney; Christopher S. Boynton, Deputy City
Attorney; Elena E. Ilardi, Associate City Attorney; Robin Tolerton,
Guardian *ad litem* for the minor children, on brief), for appellee.


     Jennifer Walker (mother) appeals the child protective order entered against her. Mother

argues that the circuit court erred by finding the evidence sufficient to issue the protective order and

that supervised visitation was appropriate. Upon reviewing the record and briefs of the parties, we

conclude that this appeal is without merit. Accordingly, we summarily affirm the decision of the

circuit court. See Rule 5A:27.

---

    [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

"On appeal, 'we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case the Department.'" Farrell v. Warren Cty. Dep't of Soc. Servs., 59 Va. App. 375, 386 (2012) (quoting Jenkins v. Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1180 (1991)).

Mother and Samuel Walker (father) are the biological parents to four children. On December 25, 2017, the Virginia Beach Child Protective Services (CPS) received a referral for emotional abuse against the parents' seventeen-year-old son and physical neglect/inadequate shelter for their seventeen-year-old daughter, nine-year-old son, and six-year-old daughter. The report alleged that the parents were "aggressively manipulating situations to 'get rid' of" the oldest son. The parents allegedly had locked him out of the house on multiple occasions, forced him to sleep on the floor with no blankets, and denied him food. The oldest son and mother engaged in daily "shouting matches" and had had physical altercations. Mother refused to allow the oldest son to eat at the house and watched a camera to ensure that he did not sneak food out of the kitchen. Mother repeatedly told the oldest son that she wanted "him out of the house."

In addition to conflict between mother and the oldest son, the children reported "frequent conflict" between mother and father. The police had responded to more than 100 calls concerning domestic altercations at the home "over the past few years."

In January 2018, the police received two new calls for domestic violence at the house. On January 30, 2018, CPS accompanied the police when they arrested mother and father for

---

[1] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues appellant has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017).

assault and battery. The CPS worker reported that the home was "extremely cluttered and unsanitary." Clothes were piled two feet high in places, and the floor was not visible. Because mother and father were arrested, they had to make a plan for the children. They requested that the oldest son be placed in foster care, but arranged for the other three children to live with family friends. CPS determined that the home had to be cleaned before the children could reside there again.

Based on the condition of the home and the frequency of domestic violence incidents, the Virginia Beach Department of Human Services (the Department) sought a preliminary protective order. On January 31, 2018, the Virginia Beach Juvenile and Domestic Relations District Court (the JDR court) issued preliminary child protective orders and ordered the parents to cooperate with the Department. It also ordered that there be "no hostile contact including verbal or physical altercations" in the presence of the children. By orders entered on February 5, 2018, the JDR court allowed the children to return home and ordered the parents to participate in counseling and domestic violence services.

On March 1, 2018, the JDR court adjudicated that the children were at risk of being abused or neglected. After the younger son ran to a neighbor for help because father had a knife and "blood was everywhere,"[2] the JDR court ordered the parents not to reside together and "not be together around the children unless they are exchanging the children for family time or in a session with a family therapist or parent coach." The children primarily resided with mother in the family home in Virginia Beach, and father moved to his parents' home in Kenbridge.

The Department later learned that mother and father had violated the protective order because they were seen visiting with the children together. When the Department confronted mother about the incident, mother denied violating the order. Initially, mother would not allow

---

[2] Father stated that he had cut himself with the knife, and the blood belonged to him.

the social worker to enter the home, but she eventually relented. The social worker found the house cluttered again. Mother yelled at the social worker throughout the social worker's visit.

At a subsequent hearing, the JDR court ordered the parents to complete parental capacity evaluations and domestic violence assessments.[3] The JDR court also ordered that the children be assessed for individual therapy. In addition, the JDR court established a specific visitation schedule for father and the children.

Father reported that the children's first visit with him went well; however, after the children spoke with their mother in the middle of the visit, they became upset. The children told the social worker that they enjoyed the visit with father and wanted to return.

After the visit, father admitted that he had visited mother's home when the children were asleep to "attempt to work things out." When the Department asked mother about father's visit, she denied it. The Department drafted a "Protective Agreement," which provided that mother would not allow father to visit the home and that she would not contact the children while they visited father. Mother reluctantly signed the agreement. During the Department's visit, mother spoke negatively about father and the oldest son. She spoke "very loudly" even though the younger children sat at the top of the stairs and heard everything. The Department had to remind mother that she was violating the protective order by speaking negatively about father in the children's presence, but mother dismissed the Department's warning because the children were not in the room.

A second visit between the younger children and father reportedly went well. The parents continued to have disagreements with one another. Mother spoke negatively about father in the presence of the children and claimed that the children no longer wanted to visit with father.

---

[3] By the time of the hearing, the oldest two children were eighteen years old, so only the younger two children were before the JDR court.

The social worker was present during the exchange for the third visit. Mother and the older daughter caused such a scene that the social worker had to involve the police. Father left with the two younger children, who were upset about the incident. Mother screamed at the social worker and "got close in [the social worker's] face."

When the social worker appeared for an unannounced visit at mother's home a couple of weeks later, mother refused to allow the social worker in the home. As they spoke outside the home, mother began screaming at the social worker. Mother alleged that father had not paid the taxes for her vehicle, so she and the children were no longer going to any appointments or visitations. The social worker offered to help with transportation, but mother refused. The social worker left the home because mother had become so agitated.

After mother did not make the children available for father's next visit, the Department sought to remove the younger children from mother's care because of her "continued derogatory statements" regarding father and her refusal to follow through with court-ordered services for herself and the children. On June 7, 2018, the JDR court entered an emergency removal order and awarded temporary custody of the younger children to the paternal grandmother. The JDR court subsequently ordered that mother would have supervised visitation with the children.

On July 17, 2018, the JDR court adjudicated that the younger children were abused or neglected, or at risk of being abused or neglected, and entered dispositional orders at the same time.[4] The JDR court entered another child protective order, which prohibited the parents from having any "hostile contact with each other" and ordered them not to "be together around the children unless they are exchanging the children for family time or in a session with a family therapist or parent coach." The JDR court also continued its order for the parents to complete recommended services and cooperate with the Department. The JDR court further ordered

_____

[4] Mother did not appeal the dispositional orders.

supervised visitation for mother twice monthly, with one of the visits to occur near the children's residence.

The Department referred mother for a neuropsychological assessment, which was completed in the summer of 2018. The purpose of the evaluation was to "evaluate her functional cognitive, behavioral[,] emotional status in meeting daily demands." The psychologist concluded that mother's neurocognitive function was "within normal limits," so any concerns about mother's decision-making or judgment "would be related to non-neurologically based concerns such as personality characteristics and/or substance use/abuse."

After receiving the neuropsychological evaluation, the Department referred mother for a parenting capacity evaluation and requested that the evaluator consider whether "another mental health problem" contributed to mother's behavior or her parenting capabilities. The evaluator noticed that mother consistently "presented herself as a victim" and "denied any responsibility for the conflict between herself and [father], herself and her [older] son, herself and her daughter, herself and her neighbor, or herself and [the social worker]." The evaluator concluded that mother's "inability to take responsibility or to perceive situations accurately may have significant negative impacts on her parenting abilities."

The evaluator doubted whether mother would "easily accept or implement any feedback" because of her distrust of others. The evaluator opined that mother's "interpersonal style and propensity of persecutory thinking may impede her ability to appropriately implement the parenting knowledge she possesses into everyday life with her children." The evaluator diagnosed mother with adjustment disorder with anxiety and recommended that she participate in individual therapy "to address emotion dysregulation, interpersonal patterns, history of domestic violence, trauma symptoms, insight into her own actions, and level of suspicion and paranoia." The evaluator recommended supervised visitation between mother and the children until mother

"is able to better understand her own role and responsibility in her family's functioning." The evaluator expressed concern that mother's "own personality style may be inhibiting a healthy environment and healthy interactions with her children."

The parties appeared before the JDR court again in October 2018. The JDR court modified mother's visitation, so that one visit would occur in Virginia Beach and the other visit would occur within thirty minutes of the children's residence. The JDR court continued the requirement of supervised visitation "by a person pre-approved by [the Department] or at a supervised visitation center, at mother's expense." Mother appealed the JDR court's ruling.[5]

On February 21, 2019, the JDR court amended the child protective orders to allow supervision by certain specified individuals or a person approved by the custodians. Mother appealed the JDR court's amended orders.

On August 15, 2019, the parties appeared before the circuit court for a hearing on mother's appeals.[6] After hearing the parties' evidence and arguments, the circuit court "found the evidence sufficient to sustain the child protective order[s]" and ordered that the JDR court's orders remain in effect. This appeal followed.

ANALYSIS

Mother argues that the circuit court erred by finding the evidence sufficient to issue the child protective order and that supervised visitation was appropriate. "In matters of a child's welfare, [circuit] courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." Thach v. Arlington Cty. Dep't of Human Servs., 63 Va. App. 157, 168 (2014) (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App.

---

[5] The JDR court's child protective orders entered on October 18, 2018, included a review date of February 21, 2019.

[6] The record does not include a timely filed transcript of the circuit court hearing. See Rule 5A:8.

- 7 -

123, 128 (1991)). "This Court presumes that the circuit court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Id. (quoting Logan, 13 Va. App. at 128).

First, mother asserts that the evidence was insufficient to prove that the children were "either abused or neglected, or at risk of being abused or neglected, . . . warranting the imposition of the protective orders." She claims that "the Department has failed . . . to show that the requisite finding of abuse and neglect was made by the court and, for that reason, this Court must conclude that the evidence fails to support the imposition of the protective orders." The record, however, includes the JDR court's orders adjudicating that the children were abused or neglected, or at risk of abuse or neglect, and dispositional orders entered on July 17, 2018. Mother did not appeal the JDR court's dispositional orders, which were final orders under Code § 16.1-278.2(D). "Pursuant to the 'law of the case' doctrine, when a party fails to challenge a decision rendered by a court at one stage of litigation, that party is deemed to have waived her right to challenge that decision during later stages of the 'same litigation.'" Miller-Jenkins v. Miller-Jenkins, 276 Va. 19, 26 (2008). Therefore, mother waived her right to challenge the abuse and neglect findings.

Second, mother argues that the circuit court erred by entering the child protective order and requiring supervised visitation between mother and the children. The record does not include a timely filed transcript of the circuit court hearing.[7]

> If the transcript is not a part of the record on appeal, we cannot consider it or any references to it in addressing [mother's] arguments because "[a]n appellate court must dispose of the case upon the record and cannot base its decision upon appellant's petition or brief. . . . We may act only upon facts contained in the record."

---

[7] The circuit court entered its final order on September 16, 2019; the transcript was filed late on December 2, 2019. Rule 5A:8(a) ("The transcript of any proceeding is a part of the record when it is filed in the office of the clerk of the trial court within 60 days after entry of the final judgment.").

Browning v. Browning, 68 Va. App. 19, 26-27 (2017) (quoting Smith v. Commonwealth, 16 Va. App. 630, 635 (1993)).

"Because the judgment of the court below is presumed to be correct, the onus is upon the appellant to provide the reviewing court with a sufficient record from which it can be determined whether the trial court erred as the appellant alleges." White v. Morano, 249 Va. 27, 30 (1995); see also Robinson v. Robinson, 50 Va. App. 189, 197 (2007) ("The burden is upon the appellant to provide us with a record which substantiates the claim of error. In the absence [of a sufficient record], we will not consider the point." (quoting Jenkins v. Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1185 (1991))).

"The sanction for failure to comply with Rule 5A:8(a) is governed by Rule 5A:8(b)(4)(ii), which provides that '[w]hen the appellant fails to ensure that the record contains transcripts . . . *necessary* to permit resolution of appellate issues, *any assignments of error affected by such omission* shall not be considered.'" Browning, 68 Va. App. at 28 (emphasis in original). "[F]or any assignments of error for which the arguments below are 'contained within the untimely-filed transcript' and for which the subject transcript is 'indispensable to the determination of th[e] issue[s],' those assignments of error are 'waived on appeal.'" Id. at 30 (quoting Shiembob v. Shiembob, 55 Va. App. 234, 246 (2009)).

The transcript from the circuit court hearing is indispensable for a review of mother's arguments. "Without the transcript, we cannot know with certainty the arguments made by the parties or the evidence that the trial judge could consider." Id. Accordingly, we find that mother's assignment of error is waived.

CONCLUSION

For the foregoing reasons, the circuit court's ruling is summarily affirmed. Rule 5A:27.

Affirmed.